IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JASON BOYD and KRISTI BOYD,<br><br>**Plaintiffs,**<br><br>v.<br><br>NATIONAL FIRE AND MARINE INSURANCE COMPANY,<br><br>**Defendants.** | Case No. 3:19-CV-00727-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the court is a Motion for Summary Judgment (Doc. 21) filed by Defendant National Fire and Marine Insurance Company ("National"). For the reasons set forth below, the Court grants in part and denies in part the Motion.

### FACTUAL & PROCEDURAL BACKGROUND

This action stems from a dispute over the precise extent of an insurance policy purchased to cover a property at 724-726 North 13th Street, East Saint Louis, IL (the "Object"), which was substantially damaged in a fire on September 30, 2018 (Doc. 21 at 10).

The Object was purchased by Plaintiffs Jason and Kristi Boyd ("the Boyds") for approximately $58,000 on March 10, 2017 (Doc. 21 at 11). Before closing, the Boyds's lender obtained an appraisal valuing the Object at $68,000 (Doc. 21-1). In connection with the purchase, the Boyds went to an insurance broker, Christopher Hudlin, who helped the Boyds to prepare an application for property insurance coverage for the Object (Doc.

29-1). That application was then submitted to several insurance providers, including National (*Id.*). National responded to the application, and Hudlin's insurance agency requested that National bind the coverage and issue the policy (Doc. 29-1 at 6). The property section of that application specified that the Boyds were seeking coverage for the Object in the amount of $500,000, described as "ACV" or actual cash value (*Id.* at 32). Hudlin noted that the definition of actual cash value could vary depending on the insurance company, but that his understanding was that "in the event of a fire, [the insurance company] would give them pretty close to $500,000 plus or minus a few dollars for this and that" (*Id.* at 10). Hudlin indicated that his main impression was that coverage was sufficient that the Boyds would be "made whole" and that National never noted that the property was overinsured or quoted insurance for a lower valuation (*Id.* at 12).

National issued Policy No. 12PRM037507-02 ("the Policy") to the Boyds, which insured the Object and was effective April 4, 2017 (Doc. 1-1). The Policy contains a Vacant Building Property Coverage Form that provides certain "Loss Conditions," including Loss Payment and Valuation Provisions that specify how the value of Covered Property will be determined in the event of loss or damage. Those provisions include the following:

4. **Loss Payment**
d. We will not pay you more than your financial interest in the Covered Property.
…

6. **Valuation**
We will determine the value of Covered Property in the event of loss or damage as follows:

At actual cash value as of the time of loss or damage, except as provided in b., and c.
…

d. **Actual Cash Value** ("ACV")
Actual cash value is defined as follows:
   (1) when the damage to property is economically repairable, "actual cash value" means the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration, and obsolescence;
   (2) when the loss or damage to property creates a total loss, actual cash value means the market value of the property in a condition equal to that of the destroyed property, if reasonably available on the used market or
   (3) otherwise actual cash value means the market value of new property of like kind and quality, less reasonable reduction for wear and tear, deterioration, and obsolescence.

(Doc. 1-1).

On September 30, 2018, a fire occurred which substantially damaged the Object. The Object was vacant at the time. On or about March 25, 2019, the Boyds submitted a proof of loss document from their public adjustor indicating losses amounting to $479,486.54, based on the cost of repairs, less deductions per the Policy's valuation provisions. The Boyds requested that National Fire agree to an appraisal of the value of the loss to the Object pursuant to the "Appraisal" clause of the Policy, which states that if the parties disagree as to the value of a loss:

> "…either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a Judge of a Court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding."

(Doc. 1-1).

On April 12, 2019, National Fire rejected the Boyds's appraisal demand, advising that the actual cash value definition in Valuation Provision ¶6(d)(2) applied, and requesting additional information regarding the market value of the property to facilitate

its review of the Claim. National Fire's real estate appraiser, Patrick Tobin, determined that the market value of the Building on the date of the loss, exclusive of land value, was $120,000.00. Relying on Tobin's initial report, and after application of the Policy deductible, National Fire made payment to the Boyds in the amount of $107,500.00. The Boyds's June 5, 2019 letter also reasserted that the market value approach of ¶6(d)(2) is inapplicable, "as the loss does not exceed" the policy limit of $500,000.00 and they accepted the $107,500.00 payment check "as a partial payment" of the insureds' claim.

On May 16, 2019, the Boyds filed suit in the Circuit Court of Madison County, Illinois, seeking to compel National to participate in the appraisal process (Doc. 1-1). National removed to this Court on July 3, 2019 (Doc. 1). Based on information subsequently acquired in discovery, National subsequently revised its appraisal of the value of the Object at the date of the loss, excluding land value, to $68,000 (Doc. 21-5). The Boyds have not obtained a real estate appraisal of the market value of the Object on the date of the loss, exclusive of land value (Doc. 21 at 14). National filed for Summary Judgment on February 3, 2020, and the Boyds responded on July 30, with National replying on August 28. Both parties agree that the only issue to be decided before the Court is the correct interpretation of the valuation provisions of the Policy. National seeks to have the Court declare that §§ 4(d) and 6(d)(2) apply and require payment of market value, while the Boyds seek to have the Court declare that 6(d)(1) applies and that repair costs should be paid.

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

## ANALYSIS

A. *Applicable Law*

Under Illinois law, applied here pursuant to the Court's exercise of diversity jurisdiction, the interpretation of an insurance policy presents questions of law that are

suited to decision at the summary judgment stage. *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 526 (7th Cir. 2013). Interpretation of an insurance policy follows the same rules of contract construction as other contracts. *Neth. Ins. Co. v. Phusion Projects, Inc.*, 737 F.3d 1174, 1177 (7th Cir. 2013).

In interpreting a contract, a district court's primary function is to give effect to the intent of the parties, giving effect to the express language of the contract if unambiguous and not contrary to public policy. *Id.* A court may, however, find a contract ambiguous if the language is susceptible to more than one reasonable interpretation, and may consider extrinsic evidence of the intent of the parties to resolve the ambiguity. *Id.* Any ambiguity will be construed liberally in favor of the insured. *Id.*

B. Applicable Law

Here, the parties agree that the Boyds contracted for insurance coverage based on actual cash value and recognize that actual cash value is defined in the Policy, but disagree as to which definition of actual cash value should be applied. The key term at issue here appears to be "economically repairable," which serves as the trigger for the 6(d)(1) definition of ACV based on repair cost. The Boyds contend that "economically repairable" means that the cost of repair is less than the value of the insurance policy, but this does not strike the court as a logical reading of the plain wording of the policy. Taken in a vacuum, the phrase "economically repairable" appears to indicate something that is actually worth repair, *i.e.* the cost of repairing it does not outweigh the utility of the repaired object. Apart from being common sense, this conception of the phrase "economically repairable" does indeed appear to be the standard legal interpretation of

that term, based on the limited jurisprudence discussing the issue. *See, e.g.*, *Sherard v. Safeco Ins. Co. of Am.*, 2015 U.S. Dist. LEXIS 138548 at *20 (W.D. Wash. Oc. 9, 2015).

This interpretation is further supported when the term is considered in light of other provisions in the contract, such as 4(d), which explicitly states that the insured party will not receive more than their financial interest in the covered property. If, as the Boyds contend, "economically repairable" costs could rise to the full value of the policy, then any policy holders whose policy value to some degree exceeded the actual value of their insured property would be able to receive more than their financial interest, contradicting 4(d).

The Boyds make much of the fact that National willingly insured the Object for $500,000, a sum significantly more than its value, pointing to this fact as circumstantial evidence of intent to pay repair cost up to that value, further arguing that National should be estopped from using the market value definition of ACV based on its own failure to properly value the Object. While it is perhaps strange that the Object is significantly overinsured and that National issued a policy providing significantly more coverage than the actual value of the Object, the Court is inclined to view this as an oversight rather than an indication as to intent. The Court further finds the Boyds's estoppel argument to be unpersuasive—while National did agree to insure the Object for $500,000, a cursory reading of the Policy would have shown that the Boyds would not in fact be able to receive anywhere near that amount, given the function of 4(d).

That provision, the Boyds argue, is unenforceable, as it conflicts with the minimum requirements of Illinois's Standard Fire Insurance Policy, 215 Ill Comp. Stat § 5/397. The

Standard Policy provides that the insured will not in any event receive "more than the interest of the insured" and this simple "interest," the Boyds argue, is different and somehow greater than the mere "financial interest" discussed in 4(d). This distinction is drawn from the Illinois Supreme Court's decision in *First Nat'l Bank v. Boston Ins. Co.*, 160 N.E.2d 802, 805 (Ill. 1959). In that case, where the insured had signed a contract to sell the insured property for specified consideration, the insurance provider attempted to limit payment under the policy to the amount of the consideration remaining to be paid under the sale contract, claiming that this constituted the insured's sole interest in the property. The Illinois Supreme Court affirmed a judgment in favor of the plaintiffs, finding that their interest in the property was not limited to the agreed sale price despite the executed contract. That case should be seen as standing for the proposition that the value of an insured party's interest in a property is not fixed by an executory contract, but it does not mean that a party's interest somehow exceeds the objective monetary value of the property. On the contrary, the case indicates that where an executory contract applies a price that is below market value, the market value of the property should still apply to valuation under an insurance policy. Here, National does not appear to be seeking to pay the Boyds a price that is arbitrarily taken from a single executory document. Rather, National's estimate is based on prevailing market conditions and appears to be a reasonable estimate of the value of the Object before its destruction.

For the reasons discussed above, the Court is convinced that the position of the Boyds is erroneous, that the property is not "economically repairable," and that 6(d)(1) does not apply here. Furthermore, the Court finds that 4(d) does apply. This does not

automatically mean that 6(d)(2) applies, however. Just as 6(d)(1) is triggered by the phrase "economically repairable," 6(d)(2) is triggered by the phrase "total loss." There are a number of different tests that have been used in various jurisdictions to determine when a total loss has occurred. 12 Couch on Ins. § 175:65; 46 C.J.S. Insurance § 1589. These tests generally involve a determination that the property is completely destroyed to the point that it has lost its identity as a structure, cannot be restored to use, or has lost all but nominal value. *Id.* The parties have presented minimal briefing on the issue of the current status of the structure and the proper definition of total loss, and the Court finds that there are factual issues remaining here. Accordingly, the Court finds that summary judgment is not warranted on the issue of whether 6(d)(2) or 6(d)(3) should be applied.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment.

**IT IS SO ORDERED.**

**DATED:** September 15, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**